UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ALROY RICHARDS,

                          Plaintiff,

                - against -

NEW YORK CITY HEALTH AND
HOSPITALS CORP.,

                        Defendant.
-----------------------------------------------------------x

                                 **MEMORANDUM & ORDER**
                                21-CV-6027 (PKC) (MMH)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Alroy Richards ("Plaintiff"), proceeding *pro se*, brings this action against his former employer, New York City Health and Hospitals Corporation ("Defendant" or "NYCHH"), alleging violations of 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Fourteenth Amendment, and New York City Administrative Code §§ 8-101 *et seq.* ("NYCHRL"), as well as claims for breach of contract and "hostile work environment."[1]  Before the Court is Defendant's motion to dismiss.[2] For the reasons discussed below, the Court grants Defendant's motion and this case is dismissed.

---

[1] While Plaintiff placed his "hostile work environment" claim under the "state law" section of his form complaint, the Court construes this claim to be brought under the NYCHRL, which Plaintiff refers to on the next line of the operative complaint.  (*See* Second Amended Complaint, Dkt. 40, at ECF 4.)  The Court notes that citations to ECF refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[2] Defendant's request to file a Certificate of Service of its Motion to Dismiss under seal because it contains Plaintiff's contact information is granted.  (*See* Dkt. 56-14.)

# BACKGROUND

## I.      Relevant Procedural History

Plaintiff filed his initial 347-page complaint on October 20, 2021 in the United States District Court for the Southern District of New York, utilizing that court's form for employment discrimination actions.  (Complaint, Dkts. 2, 2-1.)  On October 22, 2021, this case was transferred from the Southern District of New York to this district because a substantial part of the events giving rise to Plaintiff's claims occurred in Brooklyn, making this district the proper venue for Plaintiff's claims under 28 U.S.C. § 1391(b)(2).  (*See* Transfer Order, Dkt. 4, at 2–3.)  As directed by the Court, Plaintiff filed a more streamlined Amended Complaint on February 9, 2022 against five defendants—NYCHH; Scott Stringer ("Stringer"), in his official capacity as New York City Comptroller; Mitchell Katz ("Katz"), in his official capacity as President of NYCHH; Dorie Collington ("Collington"), Ambulatory Care Finance Director at Coney Island Hospital; and the New York State Division of Human Rights ("NYSDHR").  (Am. Compl., Dkt. 15.)

The defendants named in the Amended Complaint filed pre-motion conference ("PMC") letters requesting leave to file motions to dismiss on May 6, 2022, after being granted several extensions.  (*See* Dkt. 35 (PMC Letter for Collington, Katz, NYCHH, and Stringer); *see also* Dkt. 36 (PMC Letter for NYSDHR).)  The Court granted the PMC requests and held a conference on June 15, 2022.  (*See* 5/16/2022 Docket Order; *see also* 6/15/2022 Minute Entry.)   At the conference, Plaintiff requested leave to amend his complaint again, stating that he would drop NYSDHR, Collington, Katz, and Stringer as defendants.  (*See* 6/15/2022 Minute Entry.)  The Court granted this request, and Plaintiff filed the operative complaint—his Second Amended Complaint—on July 15, 2022, which, in addition to removing four of the five previous defendants, also "removed the 42 USC s/s 1983, relating to the Monell Claims."  (*See* Second Am. Compl.,

Dkt. 40 (hereinafter "SAC" or "Dkt. 40") ¶ 1,[3] at ECF 8.)  Hence, only NYCHH remains as a

defendant in this action.  Defendant NYCHH moved to dismiss the SAC on September 16, 2022;

that motion was fully briefed on November 14, 2022.

## II.   Relevant Facts[4]

Plaintiff, a self-identified Black man from Jamaica, was temporarily employed by

Defendant NYCHH on a two-year contract as a Hospital Care Investigator ("HCI") as part of the

Legacy System Billing Project at Coney Island Hospital—part of NYCHH's network of

hospitals—from August 2018 to August 2020.  (Dkt. 40, ¶¶ 8–10, at ECF 9–10; *id.* Ex. B, at ECF

42.)  Plaintiff is a permanent resident of the United States and has held a Green Card since October

2016.  (*Id.* ¶ 8, at ECF 9.)

Plaintiff alleges a litany of "adverse treatment" by his supervisors in the 43-page SAC.  In

essence, Plaintiff claims that, "[d]espite Plaintiff's many achievements, on the job, Defendant[]

subjected him to [d]iscrimination, which include[d] but [was] not limited to being in a Protected

Class, and on the bases of race and national original [sic]," and that he was subjected to retaliation.

(Dkt. 40, ¶ 2, at ECF 8.)  Plaintiff's job as an HCI entailed dealing with insurance-related matters

on patient accounts and identifying and handling billing issues.  (*Id.*)  Plaintiff was managed by

---

[3] The Court uses the paragraph numbering system used by Plaintiff in the document that
follows the form complaint.  (Dkt. 40, at ECF 8–37.)

[4] The Court accepts as true all factual allegations in the SAC.  *See Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009) ("[F]or the purposes of a motion to dismiss we must take all of the factual
allegations in the complaint as true[.]" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555
(2007)).

various NYCHH employees, including by Collington from approximately August 2018 to December 2018 and by Reginald Parker ("Parker")[5] from August 2019 to the end of October 2019.

Plaintiff alleges that, after he raised a work-related issue with his supervisors in October 2019, he was denied access to computer programs and functions that were necessary for him to perform HCI-related tasks and was subjected to "work responsibilities that were not part" of his job, including mail sorting, pick-ups, and deliveries. (*Id.* ¶¶ 17, 33, at ECF 5, 16–17.) These issues persisted throughout his remaining time working for Defendant; the SAC describes several incidents of poor treatment at the hands of his managers that occurred during the remainder of his contract. Finally, on August 19, 2020, Plaintiff was "summarily terminated" without notice. (*Id.* ¶ 3, at ECF 8.) Plaintiff seeks $5,000,000 in punitive, compensatory, and "other Monetary Damages," including "lost pay." (*Id.* at ECF 37.)

### A.    Plaintiff's Title VII Claims

Plaintiff states that despite being one of five HCIs hired on two-year contracts to work at Coney Island Hospital starting on August 18, 2018, only he and one other member of his cohort— a woman named Diandra Williams whom Plaintiff describes as a "[B]lack, Jamaican, Green Card holder"—did not receive contract renewals. (Dkt. 40, ¶¶ 10, 68, at ECF 10, 26.) Without attaching his employment contract to the SAC, Plaintiff claims that his employment contract was "subject to renewal." (*Id.* ¶ 10, at ECF 10.) The SAC asserts disparate treatment and retaliation claims under Title VII.

---

[5] Plaintiff refers to Parker once in the SAC as "Reginald Allen," but then uses the name "Reginald Parker" throughout. The Court construes these two names to refer to the same person, identified as "Parker" in this opinion.

Plaintiff claims that he was subjected to disparate treatment—allegedly on account of his race and citizenship—by several of Defendant's employees who were supervising Plaintiff over the course of his employment. (*See generally* Dkt. 40.) The basis for Plaintiff's retaliation claim is that his job duties changed and his employment contract was not renewed because of his extensive documentation and reporting of the disparate treatment he received. (*See id.* ¶¶ 82–85, at ECF 31–32.) He also states that during his time as an NYCHH employee, he applied for "over one hundred" promotions to other positions but received no interviews, despite other HCIs in his cohort receiving interviews. (*Id.* ¶ 41,[6] at ECF 19.)

Throughout the SAC, Plaintiff indicates that he assiduously contacted and followed up on his numerous perceived slights and grievances with many of Defendant's employees. Descriptions of the main incidents forming the basis of Plaintiff's disparate treatment and retaliation claims follow.

### 1.    October 2019 Survey Incident

Plaintiff alleges that on October 25, 2019, Parker requested that Plaintiff complete a "Voluntary Survey" containing feedback questions regarding Defendant's clinical staff members. (*Id.* ¶ 13, at ECF 11.) Plaintiff felt uncomfortable and was concerned that the survey would not be kept anonymous, and for this reason wished to submit the Voluntary Survey in hard copy instead of electronically. (*Id.*) Plaintiff alleges that Parker, in an effort to get Plaintiff to complete the survey electronically, "began hurling verbal threats" at Plaintiff, stating, "Yo, Alroy, you had better complete this Survey; you hear. Or else I will be calling [Collington] to let her know, what

---

[6] The Court notes that there are two paragraphs numbered 41 in the SAC, which both appear at ECF 19. All references to paragraph 41 in this Memorandum and Order are to the first paragraph bearing this number.

is going on." (*Id.* ¶ 14, at ECF 11.)  Shortly thereafter, Parker allegedly rolled his office chair toward Plaintiff, who was sitting in his own chair, and a "violent collision resulted." (*Id.*)  Plaintiff immediately left the area and stood in a nearby hallway, "surprised, and in fear," but Parker followed him to the hallway, demanding that Plaintiff follow him and allegedly "physically imposing himself" on Plaintiff.  (*Id.*)

Several days later, Plaintiff met with Collington to discuss this episode, which Plaintiff had notified Collington of via email.  (*Id.* ¶ 15, at ECF 11–12.)  At that meeting, Collington told Plaintiff that she had shared the contents of Plaintiff's email report with Parker and that she was aware that Plaintiff had "legal matters pending" against the City of New York "unrelated to Coney Island Hospital." (*Id.*)  Also at that meeting, Collington allegedly told Plaintiff that she would "have to let [Plaintiff] go," stating that the decision had come from "Corporate." (*Id.*)  Plaintiff thereafter submitted an "extensive, detailed letter" about his interactions with Parker and Collington to the Deputy Director of Human Resources at Coney Island Hospital, but no hearings were scheduled to discuss these episodes.  (*Id.* ¶ 16, at ECF 12.)  Following these interactions, Plaintiff was denied access to certain computer programs that were necessary for him to perform his job functions.  (*Id.* ¶ 17, at ECF 12.)  This issue persisted for months, and "after many failed attempts[] at restoration," in April 2020, Plaintiff wrote to NYCHH employees William Meredith and Lakisha Morris-Bukkannon ("Morris-Bukkannon"), whom Plaintiff was told were liaising with NYCHH to address Plaintiff's inability to access his computer programs and portals.[7]  (*See id.*)

---

[7] As Plaintiff continued to raise complaints about his lack of access to certain computer functions, meetings were held between Plaintiff and several of Coney Island Hospital's personnel, including deputy directors, the Chief Financial Officer, and the Chief Executive Officer.  (Dkt. 40, ¶ 18, at ECF 13.)  At one meeting that took place on November 4, 2019 with five NYCHH representatives, Plaintiff alleges that a Human Resources Deputy Director "shouted" that Plaintiff

2.   December 2019 Denial of Leave

Plaintiff also claims that he was denied annual leave without explanation.  (*Id.* ¶ 23, at ECF 14.)  He claims that other staff in Plaintiff's department were given leave, "even when leave was not available," or they were granted permission to take leave without pay.  (*Id.*)  This led Plaintiff to file a Notice of Claim with the New York City Comptroller's Office, requesting a 50-H hearing. (*Id.* ¶ 25, at ECF 14–15.)

3.   February 2020 Incidents

In February 2020, Plaintiff had several negative interactions with Collington.  First, in reaction to seeing him getting up to use the bathroom, Collington told him that he would not be allowed to go to the bathroom more than three times per day.  (*Id.* ¶ 26, at ECF 15.)  Around this same time, on February 6, 2020, Collington approached Plaintiff at his desk while Plaintiff was eating and told him he could not do so.  (*Id.* ¶ 28, at ECF 15.)  Plaintiff claims that no one else received this warning and that he was behaving in line with Defendant's COVID-19 protocols.[8] (*Id.* ¶ 29, at ECF 15–16.)  Plaintiff notes several other episodes of behavior that he perceived as harassment, including Collington telling Plaintiff that she would decide whom he could speak to in the hallways.  (*Id.* ¶ 31, at ECF 16.)

4.   April 1, 2020 Performance Evaluation

On April 1, 2020, after inquiring "since February 2019" about whether he would receive a performance evaluation, Plaintiff was called in for such an evaluation by Morris-Bukkannon,

---

must "sit down" and said that the participants in the meeting would decide when he could get up. (*Id.* ¶¶ 19–20, at ECF 13.)

[8] The Court is skeptical of Plaintiff's timeline for this event, because it was not until approximately one month later—in March of 2020—that workplaces in the United States began reacting to or implementing protocols related to the COVID-19 pandemic.

whom Plaintiff alleges had no knowledge of Plaintiff's job duties or performance.  (*Id.* ¶¶ 36–37, at ECF 17–18.)  At the conclusion of the evaluation, Morris-Bukkannon, in an "angry, annoying, aggressive tone," tried to force Plaintiff to sign a document acknowledging that the evaluation had taken place.  (*Id.* ¶ 37, at ECF 17–18.)  Plaintiff views this evaluation as "retaliatory and biased," but does not provide further detail about what was said during, or contained in, the performance evaluation he received.  (*See id.* ¶¶ 40, 46, at ECF 18, 20.)

### 5.   July 14, 2020 Webinar Incident

Plaintiff states that in July 2020, he was one of a number of NYCHH employees invited to participate in an online program on the topics of implicit bias and advancing equity, hosted by NYCHH's Diversity and Inclusion Executive, and that he received permission to participate in the course.  (*Id.* ¶¶ 52, at ECF 22; *id.* ¶ 57, at ECF 23.)  However, while doing so via a computer at Coney Island Hospital, Plaintiff alleges that Collington approached him to question what he was doing, and then "deliberately came in contact with Plaintiff's left hand (intentionally hit Plaintiff's left hand)."  (*Id.* ¶ 58, at ECF 23–24.)  Collington then "yanked Plaintiff's computer keyboard[] out of his hands[] in a menacing, aggressive, and physically threatening manner."  (*Id.* (internal quotation marks omitted).)   Plaintiff, in keeping with his custom regarding the reporting of grievances, thoroughly documented this incident by informally and formally reporting it to various NYCHH employees.  (*See id.* ¶¶ 60–62, at ECF 24–25.)  Approximately two weeks later, Plaintiff received a letter from Defendant's EEO Officer stating that Defendant found no support for Plaintiff's discrimination claims.  (*Id.* ¶ 65, at ECF 25.)

### 6.   August 19, 2020 Termination

Plaintiff alleges that on August 19, 2020, he was summoned to the office of Defendant's Deputy Director of Human Resources, Audrey Russell ("Russell").  (*Id.* ¶ 68, at ECF 26.)  When

Plaintiff arrived, Russell informed him that his contract was not going to be renewed.  (*Id.* ¶ 69, at ECF 26.)  Upon learning this news, Plaintiff was denied an opportunity to return to his desk to retrieve his personal items.  (*Id.* ¶ 69, at ECF 26–27.)  Instead, Russell told him that he had to leave at that moment because security was there to escort him from the building, and that his belongings would be sent to him.  (*Id.*)  Plaintiff perceived the situation as a "forced departure" and that he was "forced to abandon, under duress" the personal property left on his desk.  (*Id.*; *id.* ¶ 70, at ECF 27.)  As Plaintiff was being forcibly escorted from the premises, the other member of Plaintiff's HCI cohort whose contract also was not renewed—Diandra Williams—had a send-off party held in her honor.  (*Id.* ¶ 71, at ECF 27.)

**B.    Plaintiff's Fourteenth Amendment Claim**

Plaintiff alleges a cause of action under both the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  (Dkt. 40, at ECF 4, 32.)  With respect to the Equal Protection claim, apart from simply reciting the text of the Equal Protection Clause, Plaintiff states in conclusory fashion that his peer employees were treated better than Plaintiff.  (*Id.* ¶ 86, at ECF 32.)  As for his Due Process claim, Plaintiff alleges that Defendant's agents "[a]bdicated their legal, professional, moral, ethical, and social responsibilities" by not taking action in response to the formal reports he made regarding his adverse treatment.  (*Id.* ¶ 87, at ECF 32.)

**C.    Plaintiff's Breach of Contract Claim**

Plaintiff invokes this Court's supplemental jurisdiction to bring a breach of contract claim. (Dkt. 40, at ECF 9.)  As the basis of this claim, Plaintiff alleges that under his employment contract, he was entitled to three performance evaluations that never occurred.  (Dkt. 40, ¶ 88, at ECF 32–33.)  Further, though Plaintiff received one performance evaluation—the April 1, 2020 evaluation performed by Morris-Bukkannon—according to Plaintiff, this evaluation violated his employment

contract because Morris-Bukkannon was not Plaintiff's supervisor, did not know Plaintiff's job responsibilities, and at the time of the evaluation, Plaintiff was performing "manual labor" tasks unrelated to his job function.  (*Id.* ¶¶ 88, 89, at ECF 32–33.)

### D.      Plaintiff's Hostile Work Environment Claim

Plaintiff appears to invoke this Court's supplemental jurisdiction for a "hostile work environment" claim brought under the NYCHRL.  (*Id.* ¶ 95, at ECF 34.)  As the basis of this claim, Plaintiff states that he was subjected to hostilities, including a "[s]eries of verbal and/or physical attacks" by Collington and Morris-Bukkannon.  (*Id.*; *id.* ¶ 96, at ECF 34–35.)

### E.      Relevant Administrative Proceedings

Plaintiff filed complaints with both the NYSDHR and the United States Equal Employment Opportunity Commission ("EEOC") on August 27, 2020.  (*Id.* ¶ 72, at ECF 27.)  The NYSDHR determined that there was no probable cause to support Plaintiff's discrimination claims.  (*Id.* ¶ 76, at ECF 29.)  On July 21, 2021, the EEOC dismissed Plaintiff's case and issued him a right-to-sue letter.  (Dkt. 40, Ex. A.)  Plaintiff timely initiated this action in the Southern District of New York on October 20, 2021.[9]

### LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim for relief pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570);

---

[9] "In order to be timely, a claim under Title VII . . . must be filed within 90 days of the claimant's receipt of a right-to-sue letter. . . .  Normally it is assumed that a mailed document is received three days after its mailing."  *Sherlock v. Montefiore Med. Ctr.*, 84 F. 3d 522, 525–26 (2d Cir. 1996).  Because the EEOC's letter was mailed on July 21, 2021, Plaintiff had until October 22, 2021—93 days after he is presumed to have received this letter—to file his complaint.

*Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Hogan*, 738 F.3d at 514. "The plausibility standard is not akin to a 'probability' requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678; *see also Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013).  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  In considering a motion to dismiss for failure to state a claim, courts "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see also Pension Benefit Guar. Corp.*, 712 F.3d at 717 ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Pension Benefit Guar. Corp.*, 712 F.3d at 717 (quoting *Iqbal*, 556 U.S. at 679).

In reviewing a *pro se* complaint, the Court must be mindful that the plaintiff's pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976));

*see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (noting that even after *Twombly*, courts "remain obligated to construe a pro se complaint liberally").

## DISCUSSION

### I.  Plaintiff's Title VII Claims

Plaintiff attempts to state a cause of action under Title VII for employment discrimination based upon race and national origin and for retaliation.

### A.  Legal Standard

Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a Title VII claim, a plaintiff must show that he is a member of a protected class, that he was qualified for the position, and that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010). "[A]t the initial stage of the litigation . . . the plaintiff does not need substantial evidence of discriminatory intent," and need only "sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015); *see also Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) ("[A] plaintiff need only give plausible support to a minimal inference of discriminatory motivation." (internal quotation marks omitted) (quoting *Littlejohn*, 795 F.3d at 311)). Nevertheless, "a discrimination complaint . . . must [still] at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (cleaned up).

In order to adequately plead a Title VII discrimination cause of action based on race and national origin, a plaintiff must "set forth facts demonstrating that (1) [he] is a member of a protected class; (2) [he] satisfactorily performed [his] job; (3) [he] was subjected to adverse employment action; and (4) such action occurred under circumstances giving rise to an inference of discrimination based on [his] membership in the protected class." *Watson v. Williamsburg Collegiate Charter*, No. 17-CV-4150 (PKC) (LB), 2018 WL 3241316, at *3 (E.D.N.Y. July 3, 2018) (citing *Belfi v. Prendergast*, 191 F.3d 129, 140 (2d Cir. 1999)). "With regard to the fourth prong, a plaintiff must allege that an adverse employment action was taken against her because of discriminatory animus on the part of her employer." *Id.*

**B.     Plaintiff Has Not Sufficiently Alleged Disparate Treatment Under Title VII[10]**

As an initial matter, the parties do not dispute that Plaintiff is a member of a protected class under Title VII.  Nor does Defendant argue that Plaintiff performed his job in an unsatisfactory manner.  Instead, Defendant argues that Plaintiff's complaint fails because he did not suffer an adverse employment action and that, even if he did, it was not because of discriminatory animus. (Def. Mem., Dkt. 56-1 (hereinafter "Dkt. 56-1"), at 13.)  The Court agrees.

    1.     Adverse Employment Action

Plaintiff does not present the Court with an organized list of alleged adverse employment actions, but the Court reads the SAC to allege adverse actions in the following groupings: (i)

---

[10] The Court notes that it analyzes Plaintiff's claims under Title VII only because it finds that, to the extent Plaintiff alleges causes of action under either the NYSHRL or the NYCHRL, they are barred under the election of remedies doctrine because the NYSDHR and EEOC adjudicated the same claims at issue in the present lawsuit when Plaintiff filed his complaints before those bodies on August 27, 2020. *See Williams v. City of N.Y.*, 916 F. Supp. 2d 517, 521–22 (S.D.N.Y. 2013) ("The election of remedies bar [] precludes consideration of any claim—whether brought under the NYSHRL or the NYCHRL—arising out of the same incident on which [plaintiff's] [NY]SDHR complaint was based."); *see also* Dkt. 40, ¶ 72, at ECF 27.

altercations with Plaintiff's managers stemming from the October 2019 survey incident (*supra* Background Section II.A.1), the February 2020 verbal incidents between Plaintiff and Collington (*supra* Background Section II.A.3), the April 2020 performance evaluation Plaintiff received from Morris-Bukkannon (*supra* Background Section II.A.4), and the July 2020 webinar incident with Collington (*supra* Background Section II.A.5); (ii) the denial of Plaintiff's request for annual leave (*supra* Background Section II.A.2); (iii) the denial of interviews for other job openings for which Plaintiff applied (*supra* Background Section II.A); (iv) the non-renewal of Plaintiff's employment contract in August 2020 (*supra* Background Section II.A.6); and (v) Plaintiff's delegation to clerical mail duties once he was blocked from accessing the computer programs necessary to complete his duties as an HCI (*supra* Background Section II).

"A plaintiff plausibly alleges an adverse employment action if []he 'endures a materially adverse change in the terms and conditions of employment' that is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Diaz v. Poly Prep Day Sch.*, No. 21-CV-06611 (BMC), 2022 WL 2803259, at *4 (E.D.N.Y. July 18, 2022) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 125–26 (2d Cir. 2014)). "The category of employment decisions that constitute adverse actions is 'broad' in scope." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 269 (2d Cir. 2023) (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002)). Examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Feingold v. State of New York*, 366 F.3d 138, 152 (2d Cir. 2004) (alteration in original).

2.      Verbal Mistreatment by Managers and Denial of Leave

At the outset, the Court notes that "written and oral criticisms . . . even if unjustified, are not adverse employment actions."  *Diaz*, 2022 WL 2803259, at *5; *see also Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("[B]eing yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions . . . because they [do] not have a material impact on the terms and conditions of Plaintiff's employment."  (alterations in original)).  Therefore, Plaintiff's allegations with respect to the verbal altercations stemming from the October 2019 survey incident (*see supra* Background Section II.A.1), the February 2020 incidents between Plaintiff and Collington (*see supra* Background Section II.A.3), the April 2020 performance evaluation Plaintiff received from Morris-Bukkannon (*see supra* Background Section II.A.4), and the July 2020 webinar incident with Collington (*see supra* Background Section II.A.5) do not constitute adverse employment actions.

The denial of leave in December 2019 similarly does not constitute an adverse employment action.  *See Wharton v. Cnty. of Nassau*, No. 10-CV-265 (JS) (AKT), 2013 WL 4851713, at *9 (E.D.N.Y. Sept. 10, 2013) (finding on summary judgment that "requests for time off . . . do not constitute adverse employment action for purposes of Plaintiff's Title VII discrimination claims").  Indeed, Plaintiff has not alleged that these requests and the subsequent denial of those requests were "materially adverse change[s] in the terms and conditions" of his employment.  *Raspardo*, 770 F.3d at 125.

3.      Non-Renewal of Plaintiff's Employment Contract

The clearest factual allegation that could constitute an adverse employment action is Plaintiff's statement that he was "summarily terminated" when Defendant declined to renew his

two-year contract.[11]  (Dkt. 40, ¶ 3, at ECF 8.)  Courts in this Circuit have held that the non-renewal of an employment contract can constitute an adverse employment action.  *See Zaja v. SUNY Upstate Med. Univ./Upstate Healthcare Ctr.*, No. 20-CV-337 (MAD) (TWD), 2022 WL 4465498, at *8 (N.D.N.Y. Sept. 26, 2022) (collecting cases).  Despite this, however, courts in this Circuit have also recognized that where a Plaintiff has not alleged that he had a reasonable expectation of renewal for a time-limited employment contract, the non-renewal of that contract does *not* constitute an adverse employment action.  *See Tillman v. Verizon N.Y., Inc.*, 118 F. Supp. 3d 515, 534 (E.D.N.Y. 2015) (rejecting Americans with Disabilities Act claim due to a lack of an adverse employment action when defendant employer failed to renew plaintiff's three-year contract, which was not an unusual arrangement for a company that used temporary labor to meet short-term labor needs).  Despite Plaintiff's conclusory assertion that his contract was "subject to renewal," (Dkt. 40, ¶ 10, at ECF 10), the Court has no other information that Plaintiff expected—reasonably or otherwise—that his contract would be renewed.  Indeed, the time-limited nature of Plaintiff's contract is highlighted by the fact that the termination letter given to Plaintiff thanked him for his work on the seemingly limited-scope "Legacy System Billing Project."  (Dkt. 40, Ex. B.)  Without a copy of Plaintiff's actual employment contract or further context for this project, the Court can only infer that his employment at Coney Island Hospital was limited in scope and the non-renewal of Plaintiff's contract did not constitute an adverse employment action.

### 4.    Denial of Interviews for Other Job Openings

Plaintiff's allegation that he was denied "promotions" for which he applied does not merit much discussion because Plaintiff provides only the barest of details regarding this claim in the

---

[11] The Court notes that Defendant inexplicably does not address the contract non-renewal issue as a potential adverse employment action in its briefing.

SAC.  Plaintiff simply states that he applied to "over one hundred" "higher job" positions during his two years working for Coney Island Hospital, including 14 in December 2019, for which he "met the requirements," and was not offered any interviews for these positions.  (Dkt. 40, ¶ 41, at ECF 19.)  First, the Court disagrees with Plaintiff's characterization of the lack of interviews given to him for different positions as failures to promote him.  *Cf. Wharton*, 2013 WL 4851713, at *9 (finding plaintiff had mischaracterized an action as failure to promote when the record reflected that the position for which he applied had lower pay than his current role).  Furthermore, "[a] plaintiff alleging that a failure to promote or transfer constituted an adverse employment action must 'allege that she or he applied for a specific position or positions and was rejected therefrom.'" *Szwalla v. Time Warner Cable, LLC*, 135 F. Supp. 3d 34, 53 (N.D.N.Y. 2015), *aff'd*, 670 F. App'x 738 (2d Cir. 2016) (quoting *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 710 (2d Cir. 1998)). Despite the length of Plaintiff's SAC and his 379-page submission in opposition to Defendant's motion to dismiss, he has not provided the Court with details of the positions for which he applied and has thus failed to adequately plead an adverse employment action with respect to these allegations.

### 5.   Change in Job Duties

The final act that may constitute an adverse employment action is Plaintiff's allegation that he lost access to the computer functions that he needed to perform HCI duties and was instead made to perform clerical functions related to processing mail.  (Dkt. 40, ¶¶ 17, 34, at ECF 12, 17.) As an initial matter, the Court disagrees with Defendant's characterization of Plaintiff's complaints as being about "having to endure the inconvenience of taking on additional responsibilities such as sorting out mail, as well as the fact that he lost access to [Defendant's] insurance portals." (Dkt. 56-1, at 14–15.)  It is not a fair reading of the SAC to say that Plaintiff was made to take on

17

"additional responsibilities" that included mail processing.  Rather, Plaintiff alleges that he "did not consent to [mail] duties, and had complained formally[] all along[] *to be returned*" to his "Job Description duties."  (Dkt. 40, ¶ 34, at ECF 17 (emphasis added).)   The Court thus finds that Plaintiff is not claiming that he was asked to take on additional mail duties, but that he was effectively demoted to perform a more menial task than the one he was hired to perform as an HCI.

"'[R]eassignment with significantly different responsibilities' constitute[s] [an] adverse employment action[]."  *Buon v. Spindler*, 65 F.4th 64, 80 (2d Cir. 2023) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see also, e.g.*, *Lore v. Syracuse*, 670 F.3d 127, 170–71 (2d Cir. 2012) ("The transfer of an employee from an elite position to one that is less prestigious with little opportunity for professional growth is sufficient to permit a jury to infer that the transfer was a materially adverse employment action." (alterations omitted)); *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (finding adverse employment action for Americans with Disabilities Act discrimination claim where employee was transferred from duties in pharmacy to collecting shopping carts and garbage in the parking lot, though this transfer "did not affect his wages or benefits").

Therefore, while it is true that Plaintiff maintained the title of HCI throughout his two-year employment with Defendant and did not receive a reduction in his pay or benefits, by alleging that he was prevented from accessing the tools necessary to work as an HCI and was instead tasked with mailroom duties, Plaintiff has sufficiently stated an adverse employment action.  However, as discussed below, he still has not sufficiently alleged a Title VII disparate treatment claim.

### C.    Discriminatory Animus

"It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of a[] . . . protected characteristic."  *Brown v. Henderson*, 257 F.3d 246, 252 (2d

Cir. 2001).  Despite Plaintiff suffering an adverse employment action in his reassignment to mailroom duties, he has fallen short of his burden of showing that this action was because of discriminatory animus.  Indeed, the SAC is completely devoid of any allegation that the treatment Plaintiff experienced in his two years in Defendant's employ—and specifically relating to his demotion to mailroom duties—occurred because of his race or national origin.

"[A]n action is 'because of' a plaintiff's race, color, religion, sex, or national origin where it was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action." *Buon*, 65 F.4th at 82–83 (quoting *Vega*, 801 F.3d at 85).  "To state a claim that the discrimination was 'because of' the protected characteristic at issue, a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by [either] alleging facts that *directly* show discrimination *or* facts that *indirectly* show discrimination by giving rise to a plausible inference of discrimination." *Id.* (internal quotation marks omitted).

Plaintiff mentions that he is Black and from Jamaica several times in the SAC.  (*See, e.g.*, Dkt. 40, ¶ 8, at ECF 9; *id.* ¶ 74, at ECF 28; *id.* ¶ 81, at ECF 30.)  However, he goes no further than this factual recitation in his pleadings and makes no factual allegations—nor even a conclusory statement (which would be insufficient)—from which to infer that the alleged discriminatory incidents were connected to his race or national origin.  *Diaz*, 2022 WL 2803259, at *7 (dismissing Title VII claim where the plaintiff's "race and national origin were never mentioned at all" in connection with the alleged discriminatory actions made by her employer).

Instead of making any explicit allegations that the actions taken by Defendant's employees were because of discriminatory animus, Plaintiff seems to invite the Court to infer discriminatory animus through comparison with the other HCIs in his cohort and their demographics.  Yet, any

such inference is contradicted on the face of the SAC by Plaintiff's allegations that other members

of his cohort—including Diandra Williams, who he identified as Black and of Jamaican descent—

"did not [undergo] any such Discrimination, nor [the] same worse [sic] treatment[]." (Dkt. 40, ¶

41, at ECF 19.)  Therefore, because Plaintiff has alleged that a similarly situated employee who

also belongs to his protected group was treated better than him, the Court cannot plausibly infer

discriminatory animus.  And, in the absence of explicit allegations that the relegation of defendant

to mail duties—the one arguable adverse employment action alleged—was because of Plaintiff's

membership in a protected group, he has failed to state a Title VII claim of disparate treatment.

## II.   Plaintiff Has Not Sufficiently Alleged a Hostile Work Environment Under Title VII

Plaintiff brings a claim of "hostile work environment" as a fourth, independent cause of

action in his SAC, invoking this Court's supplemental jurisdiction.  (Dkt. 40, ¶ 95, at ECF 34.)  In

deference to Plaintiff's *pro se* status, the Court construes this claim to be brought under Title VII,

and finds that Plaintiff has failed to state a claim under this provision.

In order to state a claim for a hostile work environment under Title VII, "a plaintiff must

plead facts that would tend to show that the complained of conduct: (1) is objectively severe or

pervasive – [that it] creates an environment that a reasonable person would find hostile or abusive;

(2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3)

creates such an environment because of the plaintiff's race or national origin." *Diaz*, 2022 WL

2803259, at *8 (internal quotation marks omitted) (quoting *Patane v. Clark*, 508 F.3d 106, 112 (2d

Cir. 2007)).  Similar to Plaintiff's disparate treatment claim, Plaintiff's hostile work environment

claim fails because Plaintiff has not alleged any facts that his work environment was hostile

*because of* his race or national origin.  *Diaz*, 2022 WL 2803259, at *8 (rejecting Title VII hostile

work environment claim where plaintiff "failed to allege any facts that plausibly demonstrate even a single race-based incident").

Accordingly, Plaintiff has failed to state a claim for hostile work environment.

## III. Plaintiff Has Not Sufficiently Alleged Retaliation in Violation of Title VII

"To establish a prima facie retaliation claim under Title VII, a plaintiff must allege (1) participation in a protected activity, (2) the defendant's knowledge of the protected activity, (3) an adverse employment action, and (4) a causal connection between the protected activity and the adverse employment action." *Watson*, 2018 WL 3241316, at *5 (citing *Littlejohn*, 795 F.3d at 316). Here, Plaintiff does not allege a plausible claim of retaliation under Title VII because he has failed to establish that he engaged in a protected activity.[12]

"A protected activity is defined as (1) an employee's opposition to any activity which is prohibited by Title VII, or (2) an employee's participation in any Title VII investigation or proceeding." *Bass v. World Wrestling Fed'n Ent., Inc.*, 129 F. Supp. 2d 491, 502 (E.D.N.Y. 2001). "[A] complainant 'is required to have had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII.'" *Johnson v. City Univ. of N.Y.*, 48 F. Supp. 3d 572, 576 (S.D.N.Y. 2014) (quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks omitted). "'A plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form,' even when the complaint cites reprehensible language or behavior." *Id.* (quoting *Kelly*, 716 F.3d at 15).

---

[12] The Court notes that the SAC does not present an organized formulation of the specific instances Plaintiff alleges to be retaliatory actions, and indeed each of the incidents discussed in the operative complaint that were analyzed as disparate treatment, liberally construed, could also be characterized as retaliation.

The first potential protected activity identified by Plaintiff is the fact that Collington brought up Plaintiff's pending legal proceedings against New York City "unrelated to Coney Island Hospital (NYC H+H)" when Collington met with Plaintiff in the aftermath of the October 2019 survey incident, and stated that she was going to have to "let [him] go." (Dkt. 40, ¶ 15, at ECF 11–12.) This is not an adequately pleaded protected activity because Plaintiff does not allege that the legal proceedings—unrelated to his employment at Coney Island Hospital—involved unlawful practices under Title VII. Additionally, Plaintiff was not actually terminated at that time, so Collington did not, in fact, retaliate against Plaintiff because of these unrelated pending legal proceedings.

The next category of potential protected activities identified by Plaintiff involves the numerous complaints—formal and informal—he lodged during his two years at Coney Island Hospital. Plaintiff states multiple times in the SAC that "timing is important" (Dkt. 40, ¶ 17, at ECF 12; *id.* ¶ 23, at ECF 14; *id.* ¶ 26, at ECF 15), and attempts to force the conclusion that any time he complained of ill treatment he received on the job, another negative action would be taken against him. For example, Plaintiff connects the lost access to computer programs and portals necessary for him to conduct HCI duties to the complaints he made regarding the October 2019 survey and the subsequent ill treatment he received from Parker. (Dkt. 40, ¶¶ 16–17, at ECF 12.) However, the SAC is not clear on the substance of Plaintiff's written complaints to members of Defendant's staff, and, while it is likely that Plaintiff was complaining of "something that appears to be discrimination in some form," the Court cannot find without more that these complaints were "protected actions" under Title VII. *Kelly*, 716 F.3d at 15.

The only protected activity the Court finds in Plaintiff's Complaint is his dual filing of EEOC and NYSDHR complaints on August 27, 2020, after he left Defendant's employ. (Dkt. 40,

¶ 72, at ECF 27.)   Because Plaintiff does not allege any adverse employment actions to have occurred after Plaintiff left Coney Island Hospital, there can be no allegation that Plaintiff suffered any retaliation resulting from his filing of these formal complaints.

In sum, even under the most liberal interpretation of Plaintiff's allegations, Plaintiff fails to allege sufficient facts from which the Court can infer that he "was subjected to any adverse employment action in retaliation for protected activity in which []he engaged." *Watson*, 2018 WL 3241316, at *5.

## IV.   Plaintiff Cannot Allege an Independent Violation of the Fourteenth Amendment

Turning to Plaintiff's remaining federal claim, Plaintiff has also failed to plausibly plead a violation of his constitutional rights under the Fourteenth Amendment.   In the introductory paragraph of his SAC, Plaintiff specifically states that he eliminated his Section 1983 claim against Defendant because he "does not wish to complicate [the] claims."   (Dkt. 40, ¶ 1, at ECF 8.)   Later in his Complaint, Plaintiff states that he has "decided to remove the Monell Claims."   (Dkt. 40, ¶ 96, at ECF 35.)   Because Plaintiff cannot bring an action against a municipality under the Fourteenth Amendment without also proceeding under Section 1983, Plaintiff's constitutional cause of action must be dismissed.   *See Alleyne v. N.Y. State Educ. Dep't*, 691 F. Supp. 2d 322, 335 n.10 (N.D.N.Y. Feb. 24, 2010) ("[A] constitutional claim may not be brought directly under the United States Constitution where a statutory vehicle for the assertion of such a claim exists."); *see also Pauk v. Bd. of Trs. of City Univ. of N.Y.*, 654 F.2d 856, 865 (2d Cir. 1981) ("[W]hen [§] 1983 provides a remedy, an implied cause of action grounded on the Constitution is not available.").   In any event, Plaintiff's Section 1983 claims against Defendant—had they remained in the SAC—would fail because Plaintiff has not alleged a violation of a "municipal policy or practice," as required when attempting to hold a municipality liable under this statute.

*D'Alessandro v. City of N.Y.*, 713 F. App'x 1, 5 (2d Cir. 2017) (summary order) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978)).

V.     **Plaintiff's State Law Claim**

In light of the Court's dismissal of Plaintiff's Title VII and Fourteenth Amendment claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim for breach of contract, which is therefore dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).  *See Missick v. City of N.Y.*, 707 F. Supp. 2d 336, 354–55 (E.D.N.Y. 2010); *see also Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

**CONCLUSION**

For the reasons stated herein, Defendant's motion to dismiss is granted and this case is dismissed.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: November 14, 2023
           Brooklyn, New York